## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 21-cr-20115-JLK/Becerra

UNITED STATES OF AMERICA,

      Plaintiff,

v.

ROBERTO CONSOLE,

      Defendant.

_____/

## REPORT AND RECOMMENDATION[1]
## ON DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE

**THIS CAUSE** came before the Court on Defendant, Roberto Console's ("Defendant"), Motion to Suppress Physical Evidence ("Motion"). ECF No. [19]. The United States of America (the "Government") filed a Response to Defendant's Motion, ECF No. [27], and the Defendant filed a Reply, ECF No. [28]. The Court held an evidentiary hearing on this matter, ECF No. [34]. Upon due consideration of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby **RECOMMENDED** that Defendant's Motion be **DENIED**.

## I.    BACKGROUND

Defendant is charged in a one-count Indictment with knowingly possessing a firearm after having been previously convicted of a felony in violation of Title 18,

---

[1] The Honorable James Lawrence King, United States District Judge, referred this matter to the undersigned "for all such judicial proceedings as are permissible under the Magistrate's Act and the Rules of Court for the Southern District of Florida." ECF No. [20].

United States Code, Section 922(g)(1).  As described in more detail below, the Government alleges that on January 28, 2020, a City of Miami Police Department officer witnessed a black sedan speeding while driving southbound on Second Avenue before the vehicle turned left onto 64th Street.  The officer observed the vehicle make an abrupt turn onto 64th Street, such that it almost caused a collision with another car.  The officer turned around to stop the car, and although he lost sight of the car for a few seconds, the officer spotted the car that he believed was the same car that committed the traffic infraction parked in front of a residence located at 6343 Northwest Miami Place.  It was the only black sedan that the officer saw in the area.  Although the vehicle was parked, it had several occupants inside.

After the officer requested backup, several officers approached the vehicle.  Defendant was sitting in the front passenger seat, along with a male in the driver's seat and a female passenger in the back.  While officers asked the driver for his license and registration-related items, Defendant was observed putting his hands near his waistband.  Defendant was asked to step out of the car.  Once out of the car, the officers conducted a pat-down, and recovered a firearm from Defendant.

Defendant contends that, based on the totality of the circumstances, all evidence obtained pursuant to the stop and seizure, including the firearm, should be suppressed.  ECF No. [19] at 1–3.  First, Defendant argues that the City of Miami Police Department officer that conducted the stop lacked reasonable suspicion to do so because the color of the vehicle "was the sole basis" for the stop.  *Id.* at 7.  Second, Defendant argues that even if the officers had reasonable suspicion to stop the

vehicle, the officers unlawfully prolonged their seizure of Defendant as a passenger of the vehicle because they did not have reasonable suspicion to expand the scope of the seizure. *Id.* at 8–12. Finally, Defendant argues that he was unlawfully arrested without a warrant or probable cause. *Id.* at 12–13.

In response, the Government argues that the firearm was properly seized. First, the Government argues the officer had probable cause to stop the car because the officer witnessed the car speeding and nearly causing a head on collision. ECF No. [27] at 5–6. Second, the Government argues that the officer lawfully removed Defendant from the car as part of that traffic stop, and lawfully frisked Defendant for officer safety. *Id.* at 7–10.

Defendant filed a Reply requesting an evidentiary hearing and realleging that the stop and seizure violated the Fourth Amendment. ECF No. [28].

## II.    FINDINGS OF FACT

At the evidentiary hearing, the Government called two witnesses, Detective Richard Perez of the City of Miami Police Department and Probation Officer Latoya Warren, each of whom were subject to direct and cross-examination. The Government also introduced: (1) footage from the body-worn camera of Detective Perez, Govt. Ex. 1A;[2] (2) a map marked with the location of the traffic stop, Govt. Ex. 2; (3) a video of the Defendant's GPS ankle monitor coordinates, Govt. Ex. 3; and (4) still images of a map depicting Defendant's ankle monitor's GPS alerts on the date

---

[2] Although the Government included footage from the body-worn camera of Officer Manning on its Exhibit List, *see* ECF No. [32], the Government did not move to admit it into evidence, and so it is not part of the record considered by the Court.

the vehicle was stopped, Govt. Exs. 4A–D.  *See* ECF No. [32].  Based on the testimony of Detective Perez and Officer Warren, who the Court finds credible, and the other evidence submitted into the record, the Court finds as follows.

## A. Detective Perez

Detective Perez, an officer of the City of Miami Police Department for approximately eight years, is currently a detective and previously served as a K9 officer, homicide detective, and member of the problem-solving team.  In January 2020, Detective Perez was assigned to actively patrol Liberty City, Little Haiti, and the Upper East Side.  According to Detective Perez, conducting traffic stops was among his duties.

On the evening of January 28, 2020, at around 7:00 p.m., Detective Perez was driving a marked Ford Explorer K9 SUV.  While traveling northbound on Second Avenue and approaching the intersection of 67th Street, Detective Perez heard the engine of a vehicle, looked up, and saw a black sedan pass him going southbound on Second Avenue.  Detective Perez believed he saw something through the windows in the back seat which led him to believe there was more than one person in the vehicle, though he was unable to observe any description of the occupants, including race or gender.  Detective Perez observed the vehicle in his rearview mirror, and saw the vehicle make an abrupt left turn, with the tires squelching, causing another vehicle to slow down to avoid it.  Detective Perez testified that he could tell, observing from his rearview mirror, that the car turned left onto 64th Street because there is a corner store on 64th Street, and the car was next to the store as it turned.  Detective Perez

testified that he believed the speed limit in the area was thirty miles per hour. Based on his experience as a radar-laser-certified officer, he estimated that the vehicle was traveling between forty-five and fifty miles per hour. Based on these observations, Detective Perez believed that the vehicle had committed two traffic violations— speeding and making an improper left turn.

According to Detective Perez, he turned around almost immediately after observing the vehicle make the left turn in order to stop the vehicle. In doing so, Detective Perez lost sight of the vehicle for approximately fifteen to twenty seconds. According to Detective Perez, approximately ten to fifteen seconds after making the U-turn to turn left onto 64th Street, he saw a parked vehicle, backed in at 6343 Northwest Miami Place, that matched the car that he saw speeding and making the improper turn. Detective Perez testified that he was looking for a moving car, but saw no cars driving on the road, although there were other cars parked alongside the street. The vehicle at issue was the only vehicle he saw matching the description he had observed: small, black, sedan-style vehicle with clear windows, and with several occupants. Detective Perez testified that, based on his experience as a police officer, it was common to back a car into a parking space in order to avoid law enforcement's detection of the car's tag, and so that the occupants can see police approach head-on. Detective Perez testified that he believed, based on his observation of the car, that the parked car was the same car he observed earlier. He noted it was a black sedan with clear windows and multiple occupants, parked just off the street he saw the car turn onto, and there were no other cars in the area that matched the description.

Detective Perez requested backup given that he saw three occupants in the car and believed it was not safe to approach the vehicle on his own.  Further, Detective Perez testified that the area was a high-crime area known for violent crimes such as robberies, shootings, narcotics use, and gang activity.  Detective Perez drove around the block until the backup officers arrived in marked patrol cars.  Detective Perez had no other information concerning the car, Defendant, or the other occupants of the car.

After activating his body-worn camera, Detective Perez approached the vehicle, where he saw a driver, front seat passenger, and back seat passenger, along with a dog in the back seat.  Detective Perez testified that is it typical for officers to speak with everyone in the vehicle when conducting a traffic stop.  Detective Perez approached the driver, and other officers approached the other occupants of the vehicle.  Detective Perez told the driver that he had observed a car speeding and asked why he had been speeding.  According to Detective Perez, the driver was calm. Defendant had his hands raised when Detective Perez approached the car, and Defendant also had UNO playing cards and a phone in his hands.  According to Detective Perez, he observed that Defendant seemed nervous, and had an ankle monitor, which indicated to Detective Perez that Defendant was either under probation, house arrest, or in a boot camp.

At some point, one of the officers asked the driver for identification, which the driver provided.  That identification verified the driver's name.  Detective Perez could not recall whether officers also asked the back passenger for identification, but testified that officers did learn that the vehicle was parked in front of the back

passenger's family's home.   Detective Perez recalled that Defendant and the occupants said that they had been parked in that spot and playing cards for approximately one to two hours.

According to Detective Perez, the driver was "very calm," and the back passenger was "totally carefree."  However, Detective Perez described Defendant as "very nervous and . . . defensive towards the other officers on the other side of the vehicle."[3]  Detective Perez further testified that Defendant seemed "tense," as if he did not want to speak to the officers.  Detective Perez noted that Defendant provided short answers, and that he was "putting his hands up, checking his waistband, putting his hands up, checking his waistband."  Detective Perez testified that, based on his experience as a police officer, Defendant's behavior looked like a "gun check." He also testified that Defendant holding his hands up "is strange on a traffic stop." Detective Perez testified that "there was no communication amongst the officers saying that [Defendant's gun check-like behavior] was a concern."

According to Detective Perez, once other officers asked Defendant to step out of the vehicle, his attention shifted from the driver to Defendant.  Detective Perez testified that he could hear the officers give multiple commands—"easily over three times"— to step out of the vehicle, and that Defendant was "being a little belligerent" and refusing to get out of the car.  Officers then removed Defendant from the vehicle.

---

[3] The Court has referenced an unofficial transcript of the oral argument when quoting the parties' arguments or the witnesses' testimony at the hearing.  An official transcript will be filed on the docket.

Once the other officers began to remove Defendant, Detective Perez had the driver step out of the vehicle, and briefly detained him.  According to Detective Perez, he detained the driver in order to control the scene and safely investigate, given Defendant's behavior, and because he did not know what was in the vehicle. Detective Perez testified that he removed the driver from the car after returning the driver his license, and after ensuring that the car rental agreement was in order.

Detective Perez testified he did not "know exactly what led to making [the] decision" for the other officers to speak to Defendant, but that he would "assume. . . the way [Defendant] was acting, that was one of the factors."  Although Detective Perez testified that he did not tell the other officers that Defendant was reaching for his waistband, he testified that the officers who removed Defendant would have been able to see Defendant as well.

Detective Perez testified that Defendant was "kind of resisting the officers," "shaking," and "didn't want to follow their commands" to stop moving.  Detective Perez testified that officers were trying to pat him down to see if he had any weapons on him, but could not do so efficiently based on how Defendant was moving.  When Detective Perez went over to Defendant, he observed that Defendant had his legs "clenched together . . . tight . . . as if he was trying to prevent something from falling down . . . his pants."  Detective Perez testified that it is common for individuals to wear loose clothing in order to retain heavy objects such as a firearm, and in such situations, individuals need to adjust their posture to keep the firearm in place.  Upon observing Defendant's behavior, Detective Perez immediately frisked Defendant

8

between the legs and felt a firearm.  Detective Perez testified that he identified the object as a gun based on touching the outside of Defendant's clothing, the shape, feel, and weight of the gun, and his experience as an officer.  Detective Perez alerted that there was a gun, and another officer seized the firearm.

### B. Probation Officer Latoya Warren

Ms. Warren is a Correction and Probation Office Supervisor with the Florida Department of Corrections, Probation and Parole Services.  Ms. Warren has worked as a probation officer for twenty and a half years, and has been a supervisor for approximately fifteen years and six months.

As a supervisor, she ensures that officers are compliant with policies and procedures and that officers ensure offenders carry out and abide by any duties or special conditions mandated by the court.  She also monitors GPS cases to make sure officers are in compliance, conducts searches of residences, performs field work, and attends court hearings.  Ms. Warren testified that Defendant came under the supervision of the Department of Corrections after the court sentenced him and required him to wear an ankle monitor.

According to Ms. Warren, at the time of the stop, Defendant would have been wearing a two-piece ankle monitor.  One piece would be a bracelet on his leg, and the other would be an "RTC," which is a tracking device that looks similar to a cell phone.  Ms. Warren testified that the two pieces "work together" and the RTC tracks the location of the individual wearing the monitor.  She also testified that supervised offenders are supposed to have the tracking devices with them at all times.

During her testimony, Ms. Warren was shown screenshots of maps from the GPS monitoring system, *see* Govt. Exs. 4A, 4B, 4C, and 4D, ECF No. [32].  Referring to Government Exhibits 4A and 4B, respectively, Ms. Warren testified that the map showed that Defendant was at Northeast 54th Street at 6:23 p.m. and 6:29 p.m. on the night of the incident.  According to Ms. Warren, Government Exhibit 4C showed that Defendant was located near 54th Street at 7:00 p.m.  Ms. Warren testified that Government Exhibit 4D showed that Defendant was located at Northwest Miami Place, near the intersection of Northwest 64th Street, at 7:26 p.m.  Ms. Warren testified that there was no location information on the map from 7:00 p.m. to 7:26 p.m. because Defendant's monitor apparently lost its GPS signal.  Ms. Warren also testified that the signal can be lost while moving in a vehicle.  Finally, Mr. Warren testified that Government Exhibits 4B and 4C had the "No GPS" indicators, such that the last known GPS signal location was what was appearing on the map.  Ms. Warren clarified that a GPS signal would have had to be picked up, however briefly, in between the intervals in order to ping another time.

## C. The Body-Worn Camera Footage

The Government admitted 3:01 minutes of video footage from the body-worn camera of Detective Perez.  Govt. Ex. 1A, ECF No. [32].  In the video, as Detective Perez approaches the vehicle, Defendant is seen with his hands in the air.  Several other officers are standing around the car, talking to the occupants of the vehicle. Detective Perez speaks with the driver and tells the driver that he observed him speeding.  The driver laughs and tells Detective Perez that they had been there for

an hour, playing UNO.  Defendant, the front passenger, also turns to speak to Detective Perez at certain points in the video.

The officers on the passenger side of the car ask Defendant questions through the open window.  His hands are raised for much of the video, as he continuously looks around.  However, the video shows Defendant lowering his hands a number of different times, though given the angle of the camera, it is not always possible to see where his hands are placed when he lowers them.  The officers on Defendant's side of the vehicle can be heard asking Defendant why he is crossing his legs.  Moreover, at one point when Defendant lowers his hands and picks up UNO cards, it appears that officers tell him to put the cards down.  Further, for part of the time that Defendant's hands are lowered, it appears that Defendant is touching his thighs.

At the same time that the driver is given his license back, an officer can be heard saying "pull him out," in reference to Defendant.  Another officer hands the driver a paper as Defendant is being removed from the vehicle.  Although the removal of Defendant is not clearly visible on the video, given the camera angle, Defendant can be heard resisting officers' request to step out of the vehicle.  On the video, an officer says, "he's been nervous since we got here."  While other officers are removing Defendant, Detective Perez tells the driver to step out of the car, and an officer tells the driver he is being detained.  After the driver steps out of the car, Detective Perez conducts a pat-down of the driver.

Detective Perez then approaches Defendant.  Several officers are attempting to conduct a pat down of Defendant.  The officers repeatedly tell Defendant to stand

up.  Defendant can be heard saying that he is jumping up and down, and says, "I'm hurting, please."  Detective Perez approaches and pats down the Defendant. Detective Perez can be heard yelling out "gun" several times.

### III.    ANALYSIS

### A. Detective Perez Had Probable Cause To Stop The Vehicle.

"The Fourth Amendment guarantees '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause.'" *United States v. Batson*, 749 Fed. Appx. 804, 806 (11th Cir. 2018) (quoting U.S. Const. amend. IV).  "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 183 (1990)).

A seizure under the Fourth Amendment occurs when law enforcement stops a vehicle.  *United States v. Jones*, 827 Fed. Appx. 946, 948 (11th Cir. 2020) (citing *Whren v. United States*, 517 U.S. 806, 809–10 (1996)).  Further, a police officer may conduct a traffic stop if the "officer has probable cause to believe a violation of law has occurred[.]" *United States v. Weaver*, 145 Fed. Appx. 639, 641 (11th Cir. 2005) (citing *Whren,* 517 U.S. at 810).  Such "violation of law" includes traffic infractions. *See United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir. 1998) (quoting *United States v. Strickland,* 902 F.2d 937, 940 (11th Cir.1990)) ("[L]aw enforcement 'may stop a vehicle when there is probable cause to believe that the driver is violating any one of the multitude of applicable traffic and equipment regulations relating to the operation of motor vehicles.'").

Moreover, in certain circumstances, law enforcement may conduct a stop, absent probable cause, without running afoul of the Fourth Amendment. *United States v. Hensley*, 469 U.S. 221, 226 (1985); *see also Terry v. Ohio*, 392 U.S. 1 (1968). Specifically, "police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot[.]'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 30). Whether an officer has reasonable suspicion to conduct a stop depends on "'the totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). "Reasonable suspicion is 'considerably less than proof of wrongdoing by a preponderance of the evidence' and less than probable cause." *Jones*, 827 Fed. Appx. at 948 (quoting *Sokolow*, 490 U.S. at 7). Nevertheless, there must be a "minimal, particularized, and objective justification for the stop." *Id.*

Based on this record, the undersigned finds that the stop of the car was lawful, given that Detective Perez saw the car commit two different traffic infractions and therefore had probable cause to stop the car. *See United States v. Braddy*, 11 F.4th 1298, 1309–10 (11th Cir. 2021) (officer had probable cause where officer observed that bicycles were obstructing the vehicle's license plate, which he believed was a violation of Alabama law); *United States v. Brown*, 835 Fed. Appx. 551, 552 (11th Cir. 2021) ("[O]fficers had probable cause to effectuate the traffic stop [where] officers observed [defendant] park his vehicle illegally, with the tail-end of the vehicle remaining in

the road obstructing oncoming traffic."). Specifically, Detective Perez personally observed the car driving over the speed limit, and making an improper turn. The car, a black sedan with clear windows and several occupants, matched the description of the car he himself had observed seconds beforehand. Indeed, within minutes of witnessing the traffic infraction, Detective Perez located the car which he believed was the car that he had just seen. In addition, he also circled the block and saw no other car that matched the description of the car he saw commit the infractions. Further, once Detective Perez located the vehicle, he observed that the car was backed in, which he understood, based on his experience, is common when attempting to avoid police detection.

Defendant's reliance on *United States v. Jaquez*, 421 F.3d 338 (5th Cir. 2005), is misplaced. In *Jaquez*, the officers responded to reports of "shots fired." *Id.* at 340. The officer who conducted the stop "knew only that 'a red vehicle' had been involved in a reported incident approximately 15 minutes earlier, in the same general area where she first spotted the car . . . [and] . . . did not have any particular information about the vehicle, such as its make or model, or any description of its occupant(s)." *Id.* at 341. In addition to these factors, the officer stopped defendant because it was night-time and a high-crime area. *Id.* at 340. The Fifth Circuit found this "insufficient to support reasonable suspicion" because the officer knew that the vehicle was red but did not know any other facts concerning the vehicle or occupants. *Id.* at 341. However, this is not a case where such scant information was the basis for a stop. Instead, Detective Perez personally observed the car committing traffic

14

infractions, as opposed to receiving the information from a BOLO. Thus, the description Detective Perez provides as the basis for the stop was based on his *own* observation of the car that he saw speeding and which he only lost sight of for seconds. In addition to the car matching the description of the car that he had seen earlier, the location of the car was also within the very area that he saw the car go into when it turned the corner. Given that Detective Perez saw the car committing two different traffic infractions, he had probable cause to stop it.[4]

### B. The Officers Lawfully Removed Defendant From The Car As Part Of The Traffic Stop.

When evaluating a traffic stop, courts must consider "whether the stop was reasonably related in scope to the circumstances that justified it in the first place." *United States v. Gibbs*, 917 F.3d 1289, 1294 (11th Cir. 2019). A traffic stop may include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez v. United States*, 575 U.S. 348, 355 (2015). Moreover, "[t]he purpose of a traffic stop also includes attending to any related safety concerns, including 'the government's officer safety interest [that] stems from the mission of the stop itself.'" *United States v. Burwell*, 763 Fed. Appx. 840, 850 (11th Cir. 2019) (quoting *Rodriguez*, 575 U.S. at 356). Thus, given officer safety considerations that

---

[4] Defendant argues that the car that committed the traffic infraction could have just as easily driven away onto North Miami Avenue. To be sure, that *could* have happened, but the standard here is probable cause, and as to that, losing sight of a moving car for seconds, given this evidence, does not convince the Court that Detective Perez no longer had probable cause to stop the car.

accompany a lawful traffic stop, "officers also may take steps that are reasonably necessary to protect their personal safety . . . including requiring the driver and passengers to exit the vehicle as a matter of course." *Gibbs*, 917 F.3d at 1295 (citation and quotation omitted) (emphasis removed).  Such safety interests are "different in kind from the Government's endeavor to detect crime in general." *Burwell*, 763 Fed. Appx. at 850.

Additionally, an officer "may conduct certain unrelated checks during an otherwise lawful traffic stop so long as the officer does not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Braddy*, 11 F.4th at 1310 (citation and quotations omitted).  Indeed, "[o]fficers have a duty to investigate suspicious circumstances that come to their attention during a traffic stop." *United States v. Harris*, 928 F.2d 1113, 1117 (11th Cir. 1991).  Thus, in order to prolong a traffic stop, or expand its scope, an officer must have "the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez*, 575 U.S. at 355; *see also id.* at 350 ("[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures.").  Moreover, when considering the reasonableness of a stop's duration, "[r]igid time limitations and bright-line rules are generally inappropriate." *Braddy*, 11 F.4th at 1310 (quoting *United States v. Holt*, 777 F.3d 1234, 1256 (11th Cir. 2015)).

Defendant challenges the lawfulness of his removal from the vehicle by arguing that officers removed Defendant after the traffic stop had ended, and therefore,

needed reasonable suspicion to remove him from the car. As to that, Defendant contends that the officers did not have reasonable suspicion to remove him. In addition, Defendant argues that the factual record does not support a finding of reasonable suspicion, since the officer that removed Defendant from the car did not testify. The Government responds that removing Defendant from the car was part of the traffic stop, and as such, the officers were not required to have reasonable suspicion. ECF No. [27] at 7. Moreover, even if the traffic stop had already concluded, the Government argued at the hearing that there was reasonable suspicion based on Defendant's conduct before the end of the stop, a conclusion which is supported by the body-worn camera video that was introduced into evidence and Detective Perez's testimony.

Based on the undersigned's review of the record, removing Defendant from the car was clearly part of the traffic stop. Although Defendant argues that he was removed from the vehicle following completion of the traffic stop, the record does not support such a conclusion. The body-worn camera footage shows that as one officer returned the license to the driver, another officer said, clearly in reference to the Defendant, "pull him out."[5] Based on the undersigned's view of the video, the stop may have been winding down but it was not over.

Moreover, the evidence does not support a finding that the officers prolonged the stop in order to conduct an unrelated investigation. Detective Perez testified that the stop lasted approximately seven minutes, from the beginning of the stop to

---

[5] An officer is seen handing some form of paper, possibly the rental agreement, back to driver while other officers remove Defendant from the car.

putting Defendant in the back seat of the police car.  Indeed, the body-worn camera footage is three minutes long and begins right after Detective Perez arrives on the scene, which was only seconds after the other officers arrived.  Although there is no bright-line rule concerning the reasonable duration of a traffic stop, seven minutes surely is not an unreasonable length of time for officers to complete the mission of a traffic stop.  *See United States v. Purcell*, 236 F.3d 1274, 1279 (11th Cir. 2001) ("Fourteen minutes is not an unreasonable amount of time for a traffic stop.  We have approved traffic stops of much longer duration.")*; see also United States v. Young*, No. 15-60328-CR, 2016 WL 11431025, at *3 (S.D. Fla. Nov. 8, 2016), *report and recommendation adopted*, No. 0:15-CR-60328-RLR, 2016 WL 6829447 (S.D. Fla. Nov. 21, 2016) (finding the duration of a traffic stop reasonable where the officer questioned defendant about a discrepancy on his documents, "asked questions about [d]efendant's criminal background, ran a driver's license check, and asked for consent to search the car before calling the K-9 unit to the scene" which "took approximately 15 minutes, which is clearly a reasonable amount of time . . . to inquire on these issues" and the officer "was still in the process of writing the three traffic citations").  Indeed, the body-worn camera video shows that the officers at the passenger door were observing and asking Defendant to stop moving his hands throughout the video.  This is simply not a case where the stop was over and the police were prolonging the stop in order to gather more evidence to support their investigation.

Because Defendant was removed from the car during the traffic stop, the officers could lawfully remove Defendant for their safety.  Indeed, "this Court has

consistently held that [d]uring a lawful traffic stop, officers also may take steps that are reasonably necessary to protect their personal safety . . . including requiring the driver and passengers to exit the vehicle as a matter of course." *See Gibbs*, 917 F.3d at 1295 (quoting *United States v. Spoerke*, 568 F.3d 1236, 1248 (11th Cir. 2009) (quotations omitted). Indeed, the Supreme Court has recognized that the inherent dangers of a traffic stop render safety interests part of the stop itself. *See Rodriguez*, 757 U.S. at 356. In short, the removal of Defendant before the traffic stop's completion was part of the ordinary course of safety measures, which have routinely been recognized as part of the stop itself. *See id.* (quoting *Maryland v. Wilson*, 519 U.S. 408, 414 (1997) (noting that the "risk [faced by officers in conducting traffic stops] may be 'every bit as great' from a passenger as from a driver and, thus, ordering a passenger to exit the vehicle reduces this risk by denying him 'access to any possible weapon that might be concealed in the interior of the passenger compartment.'"); *Burwell*, 763 Fed. Appx. at 850–51 (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977)) ("[I]t is well-settled that an officer may direct a driver to get out of the car during a lawful traffic stop"). Thus, officers do not require additional reasonable suspicion beyond the purpose of the stop to remove individual from the vehicle. Here, the officers were not conducting an investigation that was unrelated to the stop. Rather, they removed Defendant as part of the stop, which the law clearly allows them to do. *See Gibbs*, 917 F.3d at 1294–95.

However, even if the traffic stop had in fact concluded before Defendant was asked to step outside of the car, as Defendant argues, the officers clearly had

reasonable suspicion to remove Defendant from the vehicle.  "Reasonable suspicion exists when an officer ha[s] a particularized and objective basis for suspecting the person stopped of criminal activity." *United States v. Rosian*, 822 Fed. Appx. 964, 967 (11th Cir. 2020) (quotations and citation omitted).  The reasonable suspicion analysis is an objective one—an officer's subjective motivations are irrelevant. *See United States v. Byron*, 817 Fed. Appx. 753, 757 (11th Cir. 2020) (quoting *United States v. Lewis*, 674 F.3d 1298, 1304 n.3 (11th Cir. 2012)) ("[A] police officer's subjective motivations for conducting a stop have no bearing on the objective inquiry into whether the stop is reasonable under the Fourth Amendment.").  Accordingly, reasonable suspicion must be based on objective facts. *Id.*  In determining whether reasonable suspicion exits, courts "evaluate the totality of the circumstances surrounding the stop, including the collective knowledge of all officers involved in the stop." *United States v. Bishop*, 940 F.3d 1242, 1249 (11th Cir. 2019) (citing *United States v. Cotton*, 721 F.2d 350, 352 (11th Cir. 1983)).  Officers' collective knowledge may be considered "so long as the officers 'maintained at least a minimal level of communication during their' operation." *United States v. Ingram*, No. 3:18CR44/MCR, 2020 WL 6136747, at *5 (N.D. Fla. Oct. 19, 2020) (citing *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985)).  Moreover, "[t]he officers with the actual knowledge giving rise to reasonable suspicions need not have communicated that knowledge to the detaining officer for the collective knowledge doctrine to apply." *Id.* (citing *United States v. Kapperman*, 764 F.2d 786, 791 n.5 (11th Cir. 1985)).  Rather, the "'minimal communication' requirement is met where

law enforcement officers are functioning as a team and one officer asks or instructs another officer to take some action." *Id.* (citing *Cotton*, 721 F.2d at 351–52).

Based on the factual record, the objective facts supporting the officers' reasonable suspicion to remove Defendant, clearly developed *during* the traffic stop and not after, include: (1) the vehicle was in a neighborhood known for crime, (2) Defendant's ankle monitor indicated prior criminal activity, (3) Defendant seemed unusually nervous, particularly in comparison to the other occupants, including raising his hands without instruction, (4) Defendant's demeanor toward the officers was more defiant than the other passengers, and (5) Defendant appeared to be moving his hands in a manner that at least one officer, Detective Perez, described as a "gun check."  Again, these behaviors were present throughout the duration of the traffic stop, which was relatively brief.  Indeed, as the Defense noted at the hearing, "if reasonable suspicion developed prior to the termination of the traffic investigation, then the police could have removed Mr. Console from the car afterwards. The undersigned finds that the record is sufficient to show that there was reasonable suspicion to remove Defendant from the car.  Even though the officer who removed Defendant from the car did not testify, the video and the testimony of Detective Perez are sufficient to establish that there were objective reasons that constitute reasonable suspicion.

Defendant also cites to *Byron* for support that nervousness and untruthful or implausible responses are insufficient to constitute reasonable suspicion.  *See* ECF No. [19] at 10–12 (citing *Byron*, 817 Fed. Appx. at 757, 759).  Although the Eleventh

Circuit found that there was not reasonable suspicion in *Byron*, this case is distinguishable. In *Byron*, the Government argued that the officer had reasonable suspicion of other illegal activity because of the defendant's seeming reluctance to pull over initially, "false explanation for committing the traffic violation, attempt to return to his car during the traffic stop, and nervous demeanor and behavior that persisted throughout the course of the stop." *Byron*, 817 Fed. Appx. at 758. The Eleventh Circuit noted that although nervousness is a factor to consider in determining reasonable suspicion, "some level of nervousness is to be expected" during a traffic stop. *Id.* The court also noted that providing a false explanation for committing the traffic violation is "largely innocuous and not infrequent." *Id.* at 759. The court concluded that the defendant's reluctance to stop, alone, was insufficient to constitute reasonable suspicion of other criminal activity. *Id.* Here, nervousness is not the only basis for removing Defendant. Indeed, assuming that the stop was over and that the officers needed reasonable suspicion, the officers here saw Defendant moving his hands in a manner that was described as a "gun check" in a high-crime neighborhood. Further, as opposed to "largely innocuous" behavior, Detective Perez testified that Defendant having his hands in the air during the stop was unusual. [6]

---

[6] Defendant's reliance on *United States v. Perkins*, 348 F.3d 965 (11th Cir. 2003) is similarly unpersuasive. In *Perkins*, the Eleventh Circuit found there was insufficient support for reasonable suspicion where there were insufficient additional factors beyond nervousness to justify the stop. *See id.* at 970–71. In *Perkins*, like *Byron*, the defendant's nervous behavior was not out of the ordinary for a traffic stop. *Id.* Further, the Eleventh Circuit rejected the Government's argument that defendant and his companion provided inconsistent stories, and found that "one cannot

The facts here are more closely aligned to those in *United States v. Tinker*, where the Eleventh Circuit found that there was reasonable suspicion that a defendant was armed and dangerous where the traffic stop occurred "in a high-crime area" and defendant "appeared nervous, muttered, and would not make eye contact, his right hand was shaking, and his left hand appeared to be holding an object in his waistband." 618 Fed. Appx. 635, 636–37 (11th Cir. 2015). Once the defendant stepped out of the vehicle, the defendant "adjusted the object in his waistband as if to secure it" and the officer "immediately ordered [the defendant] to face the vehicle and place his hands on it" so that the officer could conduct a pat-down search. *Id.* at 637. The officer recovered a firearm during the pat-down. *Id.* Here, similarly, officers observed Defendant's nervous behavior and gun check-like movements in an area known for crime, and thus had reasonable suspicion to remove Defendant. *See also United States v. Durrah*, 384 Fed. Appx. 970, 972 (11th Cir. 2010) ("The officers had reason to believe [defendant] was armed and dangerous, as [defendant] made a furtive movement with his right hand towards his hip and did not immediately comply with . . . orders to show his hands. Therefore, it was permissible for the officers to order [defendant] out of the vehicle and to conduct a pat-down search of his person for weapons."); *Rosian*, 822 Fed. Appx. at 967 (affirming a finding of reasonable suspicion to prolong a traffic stop and investigate further where officers

---

reasonably assume that a nervous person claiming to be an in-state resident while in possession of an out-of-state license is lying about where he or she is from and is thus a drug trafficker." *Id.* at 971. Again, unlike *Perkins*, the officers here observed more than generally nervous, innocuous behaviors.

suspected that the occupants had engaged in a drug transaction).  Although the officer that removed Defendant did not testify, there is enough on this record to support the finding that there was reasonable suspicion to remove Defendant from the car. *See United States v. Robinson*, 515 Fed. Appx. 790, 791–92 (11th Cir. 2013) ("[A]n officer's subjective intentions or beliefs are immaterial" because "[w]hether an officer has a reasonable suspicion is an objective question viewed from the standpoint of a reasonable police officer at the scene.").

Accordingly, even if Defendant's removal from the car occurred after the traffic stop was complete, it would still not run afoul of the Fourth Amendment because there was an objective, reasonable suspicion to justify his removal that was developed during an otherwise legal stop of the car.

### C. Officers Lawfully Conducted A Pat-Down Search Upon Removing Defendant From The Vehicle.

If an individual is lawfully removed from a vehicle during a traffic stop, "he may be patted down for weapons if the officer has reason to believe that his own safety or the safety of others is at risk." *Burwell*, 763 Fed. Appx. at 850–51 (citing *Mimms*, 434 U.S. at 112; *United States v. White*, 593 F.3d 1199, 1202 (11th Cir. 2010)). Specifically, "[i]f the officer has a reasonable suspicion that the person may be armed and dangerous, the officer is then permitted to conduct a limited search of an occupant's outer clothing for weapons." *Bishop*, 940 F.3d at 1248 (citing *Arizona v. Johnson*, 555 U.S. 323, 327 (2009)).  Reasonable suspicion is based on the totality of the circumstances and does not require certainty of danger, but rather that "a reasonably prudent man in the circumstances would be warranted in the belief that

his safety or that of others was in danger." *Id.* at 1248 (quoting *United States v. Hunter*, 291 F.3d 1302, 1306 (11th Cir. 2002)).  Nervousness and argumentative or non-compliant behavior are relevant factors that may be considered in evaluating reasonable suspicion. *Id.* at 1248–49.

In *Bishop*, police conducted a pat-down following a lawful traffic stop which uncovered a firearm, magazine, and drug paraphernalia.  The court determined that the defendant's "known criminal history, non-compliance, argumentativeness, and nervous, agitated behavior following lawful orders to exit the truck[,]" when viewed in the totality of the circumstances, "would cause a reasonably prudent officer . . . to believe that his safety or that of his fellow officers was in danger." *Id.* (citing *Hunter*, 291 F.3d at 1306.).

To be sure, the same facts that the Court found created reasonable suspicion to remove Defendant from the vehicle also add to the reasonable suspicion that Defendant was armed and dangerous, requiring a pat-down for officer safety.  In addition, once officers asked Defendant to step out of the vehicle, he resisted the officers' demands, and continued to resist by refusing to stand up straight.  Indeed, he was bending his legs as if he was trying to hold a weapon in place, despite officers' demands to stand up straight.  As in *Bishop*, this is sufficient to generate reasonable suspicion, in and of itself, that Defendant was armed and dangerous such that a pat-down upon removal from the vehicle was permissible.

## IV.    CONCLUSION

For the reasons stated at the hearing and as set forth above, it is hereby **RECOMMENDED** that Defendant's Motion to Suppress, ECF No. [29], be **DENIED**.

## IV.    OBJECTIONS

A party shall serve and file written objections, if any, to this Report and Recommendation with the United States District Judge for the Southern District of Florida, within **SEVEN** calendar days of being served with the Report and Recommendation.  Any response to another party's objections must be filed within **THREE** days after being served with a copy thereof.  Any request for an extension of these deadlines must be made within **THREE** calendar days from being served with the Report and Recommendation.  The parties were given ample time to argue their positions at the hearing, and the shortened period will allow for the District Court to consider the matter before the Calendar Call now set for February 10, 2022. Pursuant to Fed. R. Crim. P. 59(b), Eleventh Circuit Rule 3-1, and accompanying Internal Operating Procedure 3, the parties are hereby notified that failure to object in accordance with 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions.  *See Thomas v. Arn*, 474 U.S. 140 (1985).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, on January 25, 2022.

_____
**JACQUELINE BECERRA**
**UNITED STATES MAGISTRATE JUDGE**